## ATCHISON, T. & S. F. RY. CO. v. STATE.

### No. 1989.   Opinion Filed January 24, 1911.

1.   **STATUTES—Legislative Records—Signed Bill Conclusive Evidence.**   When an enrolled bill has been signed by the Speaker of the House and by the President of the Senate, respectively, in the presence of those bodies immediately after the bill has been read publicly at length, and the same has been approved by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the House that the act so authenticated, approved and deposited did not pass in the form in which it was signed by the presiding officers and approved by the Governor.

2.   **TAXATION—Constitutional Law—Power of Legislature.**   That portion of section 2, article 7, ch. 38 (Sess. Laws 1909), being part of an act entitled "An act for raising and collecting revenues," approved March 10. 1909, which levies annually one-fourth of one mill ad valorem tax for common-school purposes, does not violate section 20, article 10 of the Constitution.

(Syllabus by the Court.)

*Error from District Court, Logan County; A. H. Huston, Judge.*

Action by the Atchison, Topeka and Santa Fe Railway Company against the State.   Judgment for defendant, and plaintiff brings error.   Affirmed.

*Cottingham & Bledsoe,* for plaintiff in error.
*Charles West,* Atty. Gen., and *C. J. Davenport,* for defendant in error.

HAYES, J.   For convenience, plaintiff in error will be referred to as "the railway company" and defendant in error as "the state."

This cause arose in the district court of Logan county upon a submitted controversy in lieu of an action.   The railway company seeks to prevent the state from collecting a tax levied against its property for common-school purposes under a provision of an act of the Legislature approved March 10, 1909 (Sess. Laws 1909,

p. 600). Section 2, article 7 of that act provides in part as follows:

"There is hereby levied annually an *ad valorem* tax upon all property in this state which may be subject to taxation upon such basis, a tax sufficient, in addition to the income from all other sources, to pay the expenses of the state government for each fiscal year ending on the thirtieth day of June, * * * *including one-fourth of one mill for common-school purposes to be levied, collected and distributed as other school money.* * * * *"* (Italics are ours.)

The judgment of the trial court was in favor of the state. The facts agreed upon in the submitted controversy present for determination the following three questions: First. Did the act as passed by the Legislature include the foregoing italicized provision? Second. Will the courts look beyond the enrolled bill signed by the presiding officers of the two houses of the Legislature and approved by the Governor, to determine whether such bill was in fact passed by the Legislature? Third. Does said provision of the act violate section 20 of article 10 of the Constitution? The first and second of these questions will be considered together.

The railway company contends that said act (for convenience hereinafter referred to as "House Bill No. 168"), when adopted by the Legislature, did not contain the provision authorizing the levy for common-school purposes; that that provision never received the sanction of the members of the Legislature; and that such facts are disclosed by the journals of the House and Senate. Whether a court can look to the journals of either branch of the Legislature, or of both, to impeach the enrolled bill in determining whether or not it was passed in conformity with constitutional provisions, and in determining whether all the provisions contained in the enrolled bill signed by the presiding officers of the two branches of the Legislature and approved by the Governor were contained in the bill as adopted by the Legislature, is a question upon which the decided cases from the various states of the Union are in hopeless conflict; and there are many cases supporting, respectively, the affirmative and negative of the proposition. Among

those cases holding that the journal may be looked to for the purpose of impeaching the enrolled bill are the following: *Jones v. Hutchinson*, 43 Ala. 721; *Moody v. State*, 48 Ala. 115; *Burr & Co. v. Ross & Leitch*, 19 Ark. 250; *Vinsant v. Knox*, 27 Ark. 266; *Webster v. City of Little Rock*, 44 Ark. 536; *State v. Brown*, 20 Fla. 407; *State ex rel. Boyd et al. v. Deal*, 24 Fla. 293; *Butler v. State*, 89 Ga. 821; *Spangler v. Jacoby*, 14 Ill. 297; *People ex rel. Barnes v. Starne*, 35 Ill. 121; *Cohn v. Kingsley* (Idaho) 49 Pac. 985; *Keohler & Lange v. Hill*, 60 Iowa, 543; *State v. Andrews*, 64 Kan. 474; *State ex rel. v. Robertson*, 41 Kan. 200; *State ex rel. v. Francis*, 26 Kan. 724; *Haynes v. Heller*, 12 Kan. 382; *Myning v. Detroit, Lansing & Northern R. R. Co.*, 59 Mich. 257; *People v. McElroy*, 72 Mich. 446; *Board of Supervisors v. Helman*, 2 Minn. 281; *State v. City of Hastings*, 24 Minn. 78; *Miesen v. Canfield*, 64 Minn. 513; *Hull v. Miller*, 4 Neb. 503; *State v. Huff*, 18 Neb. 236; *State ex rel. Casper v. Moore*, 37 Neb. 13; *State ex rel. Wahoo Water Works Co. v. City Wahoo et al.*, 62 Neb. 40; *Opinion of Justices*, 35 N. H. 579; *Opinion of Justices*, 52 N. H. 622; *State, etc., v. Moffitt*, 5 Ohio, 359; *Fordyce v. Godman*, 20 Ohio St. 1; *Mumford v. Sewall*, 11 Ore. 67; *State v. Rogers*, 22 Ore. 349; *State v. McConnell*, 3 Lea, 332; *Gaines v. Horrigan*, 4 Lea, 608; *Brewer v. Huntingdon*, 86 Tenn. 732; *Ritchie v. Richard et al.*, 14 Utah, 345; *Wise v. Bigger et al.*, 79 Va. 269; *Meracle v. Down*, 64 Wis. 323; *Brown v. Nash*, 1 Wyo. 85; *Osburn et al. v. Staley*, 5 W. Va. 85.

At common law the rule prevailed that the enrolled bill is conclusive and may not be impeached by resort to the legislative journal (*Rex v. Arundel*, 80 Eng. Rep. [Full Reprint] 258; *Edinburgh Ry. Co. v. Wauchope*, 8 Cl. & F. 710; *The Lon. & Can. L. & A. Co. v. R. M. of Morris*, 7 Manitoba, 128) ; and the same rule is adopted in the following states cases: *Grays v. Alsap*, 1 Ariz. 274; *Sherman v. Story*, 30 Cal. 253; *People v. Burt*, 43 Cal. 560; *Eld v. Garham*, 20 Conn. 7; *State et al. v. Savings Bank*, 64 Atl. 5; *Territory v. O'Connor*, 5 Dak. 397; *State ex rel. McVey v. Burris* (Del.) 49 Atl. 930; *Evans v. Browne*, 30 Ind. 514; *State v.*

*Boice,* 140 Ind. 506; *Lewis v. State,* 147 Ind. 346; *Lafferty v. Huffman,* 99 Ky. 80; *Owensboro & Nashville Ry. Co. v. Barclay's Adm'r,* 102 Ky. 16; *Norman v. Kentucky Board of Managers,* 93 Ky. 537; *Louisiana State Lottery Co. v. Bichoux,* 13 La. Ann. 743; *Weeks v. Smith et al.,* 81 Me. 538; *Green v. Weller et al.,* 32 Miss. 650; *Ex parte Wren,* 63 Miss. 512; *Pacific R. R. v. Governor,* 23 Mo. 353; *State v. Swift,* 10 Nev. 186; *State v. Howell,* 26 Nev. 93; *Pangborn et al. v. Young,* 32 N. J. L. 29; *Ewing v. Trenton,* 57 N. J. L . 318; *People v. Devlin,* 33 N. Y. 269; *People v. Marlborough Highway Comm.,* 54 N. Y. 276; *Brodnax et al. v. Groom et al.,* 64 N. C. 244; *Power v. Kitching,* 86 N. W. 737; *Speer v. Plank Road Co.,* 22 Pa. St. 376; *State ex rel, Hoover v. Chester,* 39 S. C. 307; *Narregang v. Brown County et al.,* 14 S. Dak. 357; *State ex rel. Lavin et al. v. Bacon et al.,* 14 S. Dak. 394; *Central Ry. Co. v. Hearne,* 32 Tex. 547; *Williams v. Taylor,* 83 Tex. 667; *In Re Wellman,* 20 Vt. 653; *State ex rel. Reed v. Jones,* 6 Wash. 452.

We have not cited above all the cases that support either of the rules, but have attempted to give only a sufficient number to indicate the extent to which both rules are supported by respectable authority. It has been asserted by some of the text writers, as well as by some courts in the decided cases, that the weight of authority, numerically speaking, supports the rule that where the journal contains matters affirmatively impeaching the enrolled bill, it must prevail. Black on Interpretation of Laws, p. 225. A similar declaration is found in the first edition of Sutherland on Statutory Construction. However correct these statements may have been at the time they were written, it must now be doubted whether they speak correctly the conclusion of the authorities upon this question at this time, and in the last edition of Sutherland on Statutory Construction, at page 72, it is said:

"It is no longer true that 'in a large majority of the states' the courts have held that the enrolled act may be impeached by a resort to the journals. A comparison will show that the courts are

now about equally divided on the question. The current of judicial decision in the last ten years has been strongly against the right of the courts to go back of the enrolled act. Undoubtedly the decision of the Supreme Court of the United States in *Field v. Clark* has had much to do in creating and augmenting this current, but it may also be due to the greater simplicity, certainty and reasonableness of the doctrine, which holds the enrolled act to be conclusive. Many courts and judges, while feeling compelled to follow former decisions holding that the enrolled act may be impeached by the journals, have done so reluctantly and have expressed doubts as to the validity of the doctrine, and in many cases, as will appear in the following section, have qualified and restricted it in important particulars."

As stated in the foregoing excerpt, the courts of some of the states that have felt the rule too long established to be overturned have, neverless, been contsrained to question its wisdom. After the rule had been established in *Burr v. Ross, supra,* and followed in several subsequent cases, the justices, in delivering the opinion in *Webster v. City of Little Rock,* said:

"The legislative department of the government is equal in dignity with the judicial—co-ordinate and not subordinate. Its officers take the same oath to support the Constitution. The constitutional provisions regarding the manner in which bills are to be passed are addressed directly to them, and they are responsible to the people for an abuse of powers. No human government can be devised in which powers must not be somewhere reposed which may be abused. It is not irrational to hold that, when a legislative body has put forth a bill meaning to do so, and that bill has been duly authenticated in the prescribed manner, then the common safety of law-abiding citizens requires that the court should respect it as law, without inquiring into the modes of its passage. It is this consideration which lies at the foundation of the rule everywhere recognized, that no law can be impeached for fraudulent motives actuating the legislators, nor on account of corrupt influences brought to bear upon them. * * * In other words, the power is a dangerous one, and should never be exercised in the face of a reasonable doubt. Conforming to the practice' of the court, I desire at the same time to express my preference for the Engliish doctrine, with which I do not consider our case of *Burr v. Ross* in conflict. That is to say that an act, actually

and *bòna fide* assented to in both houses, authenticated and deposited with the Secretary of State, should be conclusive of the law, in the breasts of the judges."

Other cases in which courts have made similar criticism of this rule which they felt bound by precedent to follow, are: *People v. Starne, supra; State v. Andrews, supra;* and *State v. Moore, supra.* In *State v. Chester,* 39 S. C. 307, the court reversed the rule, notwithstanding it had been twice declared and followed in that jurisdiction in the cases of *State v. Platt,* 2 S. C. 150, and *State v. Hagood,* 13 S. C. 46; and in doing so the court used the following language:

"Therefore, however unpleasant it may be to reverse previous decisions of this court, still, after full and mature consideration we feel it to be a duty we owe the state that the case of *The State v. Platt, supra,* should be and is hereby overruled, and as the case of *The State v. Hagood, supra,* was really decided upon the authority of Platt's case, it follows necessarily that the case of Hagood must fall when the foundation upon which it rests is taken away. We announce that the true rule is, that when an act has been duly signed by the presiding officers of the General Assembly, in open session in the senate-house, approved by the Governor of the state, and duly deposited in the office of the Secretary of State, it is sufficient evidence, nothing to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an act."

The provisions of the Constitution of this state relative to the journals of each house of the Legislature are as follows: By section 30, art. 5, it is provided that:

"Each house shall keep a journal of its proceedings and from time to time publish the same. The yeas and nays of the members of either house on any question, at the desire of one-fifteenth of those present shall be entered upon its journals."

Section 31 of the same article requires that in all elections made by the Legislature, except for officers and employees thereof, the members thereof shall vote yea or nay, and each vote shall be entered upon the journal. And section 34 provides that:

"Every bill shall be read on three different days in each

house, and no bill shall become a law unless, on its final passage, it be read at length, and no law shall be passed unless upon a vote of a majority of all the members elected to each house in favor of such law, and the question, upon final passage, shall be taken upon its last reading, and the yeas and nays shall be entered upon the journal."

It will be observed from the foregoing provisions that the only specific requirements as to what shall be entered upon the journal are that each vote shall be entered in elections other than for officers and employees of either house and the yeas and nays shall be taken upon the final passage of all measures and shall be entered upon the journal. This latter requirement is made essential to the passage of the act; and, likewise, the yea and nay vote must be entered upon the journal if it be voted to dispense with the reading at length of any act before the signing of same by the presiding officer of either house in the presence of the house as required by section 35. It is the duty of each house to keep a record of its proceedings and from time to time publish the same; but, except as just mentioned, what proceedings shall be recorded in the journal, the manner of recording same, and the extent of their fullness, is left by the Constitution to the discretion of the legislative bodies, to be controlled by rule respectively of those bodies, or by statute. It is not required by any provision of the Constitution that the contents of any bill, proposed, rejected, or adopted, shall be set out in the journal, or that the contents of any amendment of any bill shall be stated in full or in substance in the journal; and a record of any such bill or amendment thereto may be kept by reference in the journal to the title of such bill or amendment or to its number.

The question now under consideration was first directly presented to the Supreme Court of the United States for determination in *Field v. Clark,* 143 U. S. 649. In that case the validity of an act of Congress was questioned upon the ground that there had been omitted from the engrossed act, as attested by the Vice-President and the Speaker of the House, as approved by the President,

and as deposited with the Secretary of State, a section that was contained in the act when it passed the two houses of Congress, and it was sought to establish this fact by reference to the journals of the two houses of Congress; but it was held that the act could not be impeached in this way. Section 5, art. 1 of the federal Constitution provides that:

"Each house shall keep a journal of its proceedings and from time to time publish the same, except such parts as may in their judgment require secrecy, and the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal."

The court, speaking through Mr. Justice Harlan of the relative weight that shall be given to the journal thus required to be kept by the houses and to the engrossed act, said:

"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution."

The doctrine of the foregoing case has been either approved or followed in the following cases from the Supreme Court: *United States v. Ballin,* 144 U. S. 3 ;*Lyon v. Woods,* 153 U. S. 662; *Hardwood v. Wentworth,* 162 U. S. 558.

Referring to the dangers which may attend the application of this rule and the abuses to which it might be subjected, the court, in *Field v. Clark,* said:

"It is admitted that an enrolled act, thus authenticated, is sufficient evidence of itself—nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them."

And to the same point, Mr. Justice Sawyer, in *Sherman v. Story, supra,* said:

"Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable

to be put in issue and impeached by the journals, loose papers of the Legislature, and parol evidence.    Such a state of uncertainty in the statute laws of the land would lead to mischief absolutely intolerable."

We do not attempt to set out all the reasoning of the courts that has been given in support of the rule in *Field v. Clark,* nor of those courts that adhere to the opposite rule; for no useful purpose could be subserved thereby, and we can add nothing to the force of the argument that has been adduced to support either of the rules or to show their respective weaknesses.    The entire field on both sides has been thoroughly covered by the authorities cited above.    To our minds the reasoning offered in support of the rule in *Field v. Clark* is satisfactory, and the rule adopted in that case appears to us to be the sounder and better rule.    In that case, however, the court specifically reserved from consideration and decision what the effect of matters expressly required by the Constitution to be entered on the journal, where the same are in conflict with the enrolled act, would have upon the validity of the act.    The conflict between the journal and the authenticated act here complained of is not as to matters which by the Constitution of this state are expressly required to be entered on the journal. It is not contended upon the final passage of House Bill No. 168 the yeas and nays were not taken or not entered upon the journal. The journal shows that such was done.    It is contended only that the journal shows that the enrolled act contains a provision that was not contained in the act when it was voted upon by both houses. As before stated, there is no constitutional provision specifically requiring that the journal shall show the contents of an act when it is passed; and it is not contended in the instant case that the journal shows the entire contents of House Bill No. 168, but that sufficient is shown to establish that it does not contain the provision involved. ˙What is the effect of failure to enter the names of those voting upon the final passage of a bill, where such record is required by constitutional provision to be made, was considered in *State et al. v. Erickson et al.,* 39 Mont. 280, where the doc-

trine of *Field v. Clark* was approved; but, by reason of the specific requirement of the Constitution of Montana, directing that the yeas and nays upon the final passage of a bill shall be taken and entered upon the journal, it was held that failure to enter the vote as directed by the Constitution invalidated the act. This question is not involved in the instant case; and we now make no decision upon it. Section 35, art. 5 of the Constitution, *supra*, not only requires that the presiding officer of each house shall sign all bills passed by the Legislature, but that he shall perform such act in the presence of the house and only after the act shall have been read publicly at length, and the fact of reading and signing shall be entered upon the journal, unless dispensed with by two-thirds vote of the quorum present. The journals of both houses disclose that House Bill No. 168 was read by the presiding officers of the respective houses and signed in the presence of those respective bodies. The correctness of that enrolled bill, therefore, is not alone attested by the signatures of the presiding officers, but by the acquiescence of the entire membership of the legislative bodies in the signing and attesting thereof by the presiding officers. This is the last official record upon the journals of the proceeding in the passage of this bill. That record, unless the integrity of the entire legislative bodies is to be impeached, is one that attests that the bill signed by the presiding officers is the one that was duly and regularly enacted by the respective houses. This provision of the Constitution, requiring the signatures of the presiding officers to be made to the bill in the presence of the legislative bodies, after the act has been publicly read at length, makes the authenticated bill as much a record of constitutional requirement as any part of the journal, and is an additional reason why the rule announced in *Field v. Clark* should be adopted in this state; and we, therefore, hold that when an enrolled bill has been signed by the Speaker of the House and by the President of the Senate in the presence of those respective bodies, immediately after the bill has been read publicly in full, and the same has been approved

by the Governor and deposited in the office of the Secretary of State, it is not competent to show from the journals of the houses that the act so authenticated, approved, and deposited, did not pass in the form in which it was signed by the presiding officers and approved by the Governor.

Section 20, art. 10 of the Constitution provides that:

"The Legislature shall not impose taxes for the purpose of any county, city, town or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes."

It is urged by able counsel for the railway company that the levy of one-fourth of one mill tax for common-school purposes, authorized by House Bill No. 168, is a tax for the purpose of a municipal corporation; and that the foregoing section of the Constitution prohibits the levy of such tax by the Legislature. Whether this contention can be sustained, depends upon whether a levy of a tax for the purpose of supporting the public schools of the state is a levy for a municipal purpose. Although this question has not been directly presented to this court heretofore in a tax case, it was, in effect, presented in the case of *Board of Education v. State*, 26 Okla. 336, 109 Pac. 563. In the first paragraph of the syllabus to that case it is said:

"The free public school system which the Legislature is directed to establish by article 13 of the Constitution is a matter of general state concern, and not a municipal affair."

In support of this conclusion, Mr. Justice Kane, who delivered the opinion of the court, offered, among others, the following reasons:

"That it was not the intention of the framers of the Constitution to intrust this important function of government to a minor political subdivision of the state is quite apparent from a casual examination of the provisions of that instrument pertaining to this subject. Section 1 of article 13, entitled 'Education,' provides that: 'The Legislature shall establish and maintain a system of free public schools,' etc. Section 3 provides that: 'Separate schools for white and colored children with like accommoda tion shall be provided by the Legislature, and impartially main-

tained,' etc.   Section 4 provides that: 'The Legislature shall provide for the compulsory attendance at some public school, unless other means of education,' etc.   Section 6 provides that: 'The Legislature shall provide for a uniform system of text-books for the common schools of the state.'   And section 7 provides that: 'The Legislature shall provide for the teaching of the elements of agriculture, horticulture, stock feeding, and domestic science in the common schools of the state.'   All of these commands are directed to the Legislature.   The word 'system' itself imports a unity of purpose as well as an entirety of operation, and the direction to the Legislature to 'establish and maintain a system of free public schools' means one system, which shall be applicable to all the public schools within the state.   *Kennedy v. Miller,* 97 Cal. 429, 32 Pac. 558.   And the idea of unity of purpose and entirety of operation is emphasized and made more apparent by the other excerpts from the Constitution above quoted."

No good cause has been shown to us in this case why the views in the foregoing case should be changed.   The mandate of the Constitution to establish and maintain public schools throughout the state is directed to the Legislature of the entire state, and not to any of the political subdivisions of the state.   The establishment and maintenance of the free public schools is a state function; and the Legislature is not only authorized to levy a tax to defray all expenses of the state in the administration of its affairs, but by section 2, art. 10, it is made the duty of the Legislature to provide by law for an annual tax sufficient with other resources to defray the ordinary expenses of the state for each fiscal year.

Section 3, art. 11 of the Constitution reads as follows:

"The interest and income of the permanent school fund, the net income from the leasing of public lands which have been or may be granted by the United States to the state for the use and benefit of the common schools, *together with any revenues derived from taxes authorized to be levied for such purposes,* and any other sums which may be added thereto by law, shall be used and applied each year for the benefit of the common schools of the state and shall be, for this purpose, apportioned among and between all the several common school districts of the state in proportion to the school population of the several districts, and no part of the

fund shall ever be diverted from this purpose, or used for any other purpose than the support and maintenance of common schools for the equal benefit of all the people of the state."

The language of the foregoing section, italicized by us, indicates that the framers of the Constitution contemplated that there would be funds derived from taxes for school purposes to be distributed; and said section prescribes how the same, together with other funds available to the state for the support of its public schools, shall be distributed. The railway company, in opposition to this inference, suggests that this language refers only to taxes "authorized"; and that, by reason of section 20, art. 10 of the Constitution, no inference in support of the power of the Legislature to levy a state tax for school purposes can follow from the foregoing section. If the railway company's contention be correct, then the language italicized is without any meaning whatever; but provisions in a Constitution, that are usually drafted after careful and deliberate consideration by the framers and are subsequently examined and considered by the people before they are adopted, are not presumed to have been added for no purpose whatever; and a construction of them that renders them meaningless will be avoided where they are susceptible of a construction that will give them force and effect, without rendering them clearly in conflict with other provisions of the Constitution. Section 9, art. 10 of the Constitution places a limitation upon the amount of *ad valorem* taxes that may be levied for all purposes by the state, county, township, city or town, and school district for any one year. The limitations prescribed by said section are as follows:

"State levy, not more than three and one-half mills; county levy, not more than eight mills; *Provided*, That any county may levy not exceeding two mills additional for county high school and aid to the common schools of the county, not over one mill of which shall be for such high school, and the aid to said common schools shall be apportioned as provided by law; township levy, not more than five mills; city or town levy, not more than ten mills; school district levy, not more than five mills on the dollar

for school district purposes, for support of common schools; *Provided,* That the aforesaid annual rate for school purposes may be increased by any school district by an amount not to exceed ten mills on the dollar valuation, on condition that a majority of the voters thereof voting at an election, vote for said increase."

The foregoing provision of the Constitution in no way limits the purposes for which the state may levy a tax, but only fixes a limitation upon the amount it may levy for all purposes. Nor can it be inferred, because this section places a limitation upon the amount of tax that may be levied for school purposes by a school district, that it was intended thereby to prohibit the state from levying any tax for school purposes. It is quite common for the states, in maintaining a system of public schools, not only to levy a state tax to aid in the support of such schools, but to provide school districts with a system of government invested with power to levy tax for school-district purposes to supplement the funds and efforts of the state to maintain a public school system, and the various school districts may thereby increase their public school facilities, subject to the limitations upon their power to tax, as the inhabitants of such districts may feel disposed to do. Section 9, *supra,* does nothing further than place two limitations upon the power of any such school district to levy a tax. The first limitation applies when the levy is made by proper authorities without a vote of the people. The other limitation is upon the increase over the first levy that may be made by a vote of the people of the district. To hold that the Constitution has made it the mandatory duty of the Legislature, as it clearly has, to establish and maintain a system of free schools; to establish separate schools for white and colored children; to provide for compulsory attendance at such schools; to provide for a uniform system of text-books; and to require certain subjects to be taught in the schools, and yet has denied to the Legislature the power to levy taxes to raise funds with which to accomplish these purposes, is to hold that the Constitution has provided a means to defeat its own purposes; that it has imposed a duty without conferring the power to execute it. The tax levied

by House Bill No. 168 is not levied upon any special district or districts in the state, but is levied uniformly upon the property of the entire state. It is not levied for the benefit of any certain school district or districts of the state, but is levied for the benefit of all the schools of the state. The only feature about the tax whatever that in any way connects it with the school districts of the state, is that in the distribution thereof it is apportioned to the districts to be expended in the maintenance of the public schools of the state. This feature of the bill only makes the districts the disbursing agents of the state for the carrying out of the purposes of the Constitution, to wit, maintaining the public schools of the state.

It follows from the foregoing conclusion that it is our judgment that the portion of House Bill No. 168 attacked in this proceeding is valid.

All the Justices concur.